IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SMK Associates, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Case No.: 1:14-cv-00284 |
| ) | |
| Sutherland Global Services, Inc., and ) | |
| Michael Bartusek, ) | |
| Defendants. ) | |

**SUTHERLAND GLOBAL SERVICES, INC.'S
MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON
COUNT I OF THE SECOND AMENDED COMPLAINT**

Defendant, Sutherland Global Services, Inc. ("Sutherland"), has moved this Court for the entry of summary and final judgment as to Count I of the Second Amended Complaint in its favor because the undisputed facts establish that, as a matter of law, Sutherland was never bound to perform under the purchase orders allegedly sent to co-defendant, Michael Bartusek ("Bartusek"), by Plaintiff, SMK Associates, LLC ("SMK").

**Factual Background**

The facts relevant to this dispute are set forth (along with supporting citations) in Sutherland's Statement of Facts as to Which There is No Genuine Dispute. ("Stat. Facts.") In sum, SMK alleges that based upon a series of communications that took place between February and July, 2012 between Bartusek, the former Chief Financial Officer ("CFO") of Sutherland, and Martin Borg ("Borg"), SMK's sole member, SMK believed that Bartusek, acting on behalf of Sutherland, offered to sell cigarettes to SMK (Stat. Facts, No. 7). SMK alleges that in reliance on these communications, it sent two purchase orders to Sutherland in June and July, 2012 totaling in excess of $84,000,000, which purchase orders contained a clause requiring Sutherland to pay a ten percent (10%) penalty to SMK in the event the purchase orders were not timely

filled. (Stat. Facts, No. 6). SMK alleges that Sutherland "accepted" those purchase orders (although it does not allege how those purchase orders were accepted), and then did not deliver these cigarettes. (Stat. Facts, No. 6). SMK's Second Amended Complaint contains three counts: (i) a breach of contract count against Sutherland seeking the penalties allegedly due under the purchase orders; (ii) a breach of contract count against Bartusek, individually, pled in the alternative to Count I if it is determined that Bartusek was not acting on behalf of Sutherland; and (iii) a fraud count against Bartusek for misrepresenting that Bartusek was acting for Sutherland. (Stat. Facts, No. 6). Sutherland answered the Second Amended Complaint, denying that it contracted to sell cigarettes to SMK, and denying that Bartusek had any authority to buy and sell cigarettes on behalf of Sutherland. (Stat. Facts, No. 7).

Sutherland's Chief Executive Officer ("CEO") and majority owner, Dilip Vellodi ("Vellodi"), and Bartusek both testified unequivocally that Sutherland is not and never has been in the business of buying or selling cigarettes, or any other consumer goods. (Stat. Facts, Nos. 8 and 9). Sutherland is in fact a business process outsourcing company. (Stat. Facts, No. 8).

Bartusek testified that he was never authorized by Sutherland to buy or sell cigarettes on behalf of Sutherland; rather, he was attempting to buy and sell cigarettes on his own in a side business which did not involve Sutherland. (Stat. Facts, No. 10). Bartusek's signature authority as CFO was set forth in the minutes of a Board of Directors' meeting held on February 15, 2008, which stated that Bartusek had the authority to bind Sutherland "*in furtherance of its ordinary business purposes* subject to the oversight, direction and control of the Chief Executive Officer." (emphasis added). (Stat. Facts, No. 11).

Borg testified that Bartusek told him that he was authorized to buy and sell cigarettes for Sutherland, although Bartusek denies he ever made such a statement. Regardless of what

Bartusek said or did not say, Borg admits that he never communicated with anyone at Sutherland, other than Bartusek, who made any representation to Borg regarding Bartusek's alleged authority to buy and sell cigarettes on behalf of Sutherland. (Stat. Facts, No. 12).

Between February, 2012 and May, 2012, Bartusek and Borg exchanged a series of e-mails regarding Bartusek selling cigarettes to SMK, many of which were sent and received from Bartusek's e-mail account at Sutherland. Not one of those e-mails stated that Sutherland would be the seller of the cigarettes. (Stat. Facts, No. 13). In February, 2012, Borg and Bartusek both executed a "Non-Circumvention Agreement" and "Agreement Not to Disclose Information, Not to Compete, and Not to Interfere With Business." Bartusek returned those documents indicating that "Kikki Distributors" was the other party to the former Agreement, and Bartusek signed the latter Agreement personally. The name of Sutherland Global Services, Inc. (or any variation thereof) does not appear anywhere on either agreement. (Stat. Facts, No. 14, 17).

According to Borg, Bartusek told him that Kikki Distributors was a subsidiary of Sutherland, while Bartusek testified that Kikki was just a name he made up. Bartusek testified that Kikki was not a subsidiary of Sutherland, and Bartusek never told Borg it was, nor did he ever tell Borg that the cigarette transactions involved Sutherland in any way. (Stat. Facts, 15, 16). Borg admitted he never did anything to verify the existence of a subsidiary of Sutherland called Kikki Distributors. (Stat. Facts, No. 15).

In late May, 2012, Vellodi discovered that Bartusek was engaging in attempting to buy and sell cigarettes from Sutherland's offices using Sutherland's facilities. Vellodi met with Bartusek and told him to stop conducting any such business from Sutherland's offices using Sutherland's facilities, and Bartusek did so. After that conversation, Bartusek used his personal e-mail and cell phone to communicate with Borg. (Stat. Facts. No 18).

According to Borg, on or about June 14, 2012, he mailed a purchase order (the "June PO") via regular first class mail marked "Confidential" to the following address: "Mr. Michael Bartusek, Sutherland Global Services, Inc., 1150 Victor-Pittsford Road, Pittsford, NY 14523" (Stat. Facts, No. 20). The June PO, which was in the amount of $81,360,000, called for monthly deliveries of cigarettes in Cyprus over an entire year, although it states that it was to be interpreted under Illinois law. The June PO was not backed by a letter of credit, nor did SMK make any deposit. Notwithstanding the fact that SMK was not financially bound in any way to perform under the enormous purchase order, the June PO stated that if delivery was not made within 25 days, then seller was obligated to pay a 10% penalty to buyer. (Stat. Facts, No. 21).

Sutherland's address is not 1150 Victor-Pittsford Road, Pittsford, NY, where Borg alleges he mailed the June PO; it is 1160 Victor-Pittsford Road, Pittsford, NY. (Stat. Facts, No. 22). Both Bartusek and his executive assistant at Sutherland, Kelly Flanegan ("Flanegan"), testified that Flanegan regularly opened all Bartusek's mail, and neither of them ever saw the June PO until after this dispute arose in the fall of 2012. (Stat. Facts, Nos. 23, 24). Bartusek also testified that the enormous purchase order did not even reflect anything that Borg and Bartusek had ever communicated about—in fact, they never discussed installment purchases at a set price being available over a one-year period because the market they were dealing in was solely when product became available. (Stat. Facts, No. 24). There is no writing of any kind evidencing that Bartusek and/or Sutherland ever accepted or even saw the June PO, that Bartusek had authority to enter into such a huge transaction, nor is there a contract, nor any Sutherland Board resolutions approving this huge transaction. Instead, Borg testified that Bartusek told Borg that he received that purchase order in a subsequent telephone conversation, which Bartusek denies ever happened. (Stat. Facts, No. 25).

Notwithstanding the enormous June PO, neither Borg nor SMK nor any business entity owned or controlled by Borg has ever actually completed a purchase or sale of cigarettes where product and money actually changed hands. (Stat. Facts, Nos. 26, 27). At the time he started communicating with Bartusek, Borg had no knowledge whether Sutherland ever bought or sold a single cigarette either. (Stat. Facts, No. 28).

When Borg allegedly mailed the June PO in the amount of $81,360,000 to Bartusek, SMK did not have the ability to fund that enormous purchase with its own funds. Rather, SMK had to rely on cash from other third-party purchasers to complete any purchase transaction. (Stat. Facts, No.29). Yet at his deposition, Borg could not identify a purchaser ready, willing and able to fund such a large purchase of cigarettes. Borg simply testified that he had exchanged e-mails with some overseas buyers whose names he could not recall from countries he could not remember who he had never met or dealt with, and one of them would have purchased the cigarettes if he had obtained them from Sutherland. (Stat. Facts, No. 30).

According to Borg, even though no delivery had ever been made on the June PO, on or about July 13, 2012, he mailed another Purchase Order (the "July PO") foe cigarettes to Bartusek marked "Confidential" to the same (wrong) address that he sent the June PO. The July PO was in the amount of $2,880,000, and it provided that if delivery was not made within 10 days in Dubai , seller would owe buyer a 10% penalty. (Stat. Facts, No. 31). Flanegan, Bartusek's executive assistant at Sutherland, testified that she remembers opening an envelope containing the July PO; she remembered that document because it was the largest Purchase Order or invoice she had ever seen. She testified that she placed the July PO on Bartusek's desk and never saw it again. (Stat. Facts, No. 32).

As was true with the June PO, there is no writing of any kind evidencing that Bartusek and/or Sutherland ever accepted the July PO. Borg testified that he discussed the July PO with Bartusek, which Bartusek expressly denied. Bartusek does not remember seeing the July PO until after this dispute arose. (Stat. Facts, Nos. 33, 34) SMK still did not have the ability to fund any purchase with its own funds, and Borg could not identify any actual purchaser who had funds to complete that purchase in Dubai 10 days after the July PO. (Stat. Facts, No. 35, 36).

## ARGUMENT

This case involves a bizarre claim and an outrageous fact situation: a plaintiff who has admittedly never bought and sold a single cigarette, and which never had any money to actually do so, is seeking huge damages from Sutherland, a company which has never bought and sold a cigarette, nor ever intended or purported to do so, based upon two POs seeking to buy over $84,000,000 worth of cigarettes. This claim is not based on a written contract signed by the parties, which would have been expected in such an enormous "deal", but solely upon the terms of written purchase orders that SMK alleges it created and sent through ordinary mail marked "Confidential" to a wrong address. SMK did not put up a penny, had no funds of its own, and cannot identify a purchaser, and there is no evidence that Sutherland accepted, or even saw, those purchase orders, other than Borg's self-serving, disputed testimony as to what Bartusek allegedly told him. Nonetheless, SMK pursues this case in federal court hoping that it will hit the lottery.

While this case is outrageous, SMK will undoubtedly argue that while its case may look weak (which is undeniable), summary judgment should not be entered because SMK has raised issues of fact. However, certain undisputed facts show that summary judgment should be entered in favor of Sutherland and against SMK, regardless of what Bartusek said or did not say. That is because the undisputed facts have established the following:

a. Bartusek had no authority – either actual or implied – to enter into an obligation for Sutherland to sell SMK over $84,000,000 in cigarettes;

b. SMK was not "ready, willing and able" to complete the purchases referenced in the POs because it had no money of its own, no credit facility in place, nor any third-party purchaser ready to fund such purchases on the dates deliveries were allegedly due;

c. The two POs are unenforceable under the Uniform Commercial Code; and

d. There is no admissible evidence that can be presented at trial to show the large purchase order dated June 14, 2012 was ever received by Sutherland.

## I. THE STANDARDS FOR SUMMARY JUDGMENT

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In determining whether a "genuine issue" exists for purposes of summary judgment, the court's sole function is to determine whether sufficient evidence exists to support a verdict in the non-movant's favor. *Dougherty v. Zimbler,* 922 F. Supp. 110, 113 (N.D. Ill. 1996) citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986).

Where a party will have the burden of proof on an element essential to its case at trial and does not, after adequate time for discovery, make a showing sufficient to establish the existence of that element, there is no genuine issue as to any material fact, since a failure of proof concerning an essential element of the non-movant's case necessarily renders all other facts immaterial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552 (1986).

## II. SUTHERLAND CANNOT BE BOUND BY BARTUSEK'S ACTIONS OR STATEMENTS BECAUSE BARTUSEK HAD NO AUTHORITY

As noted above, the undisputed facts in this case have established that Sutherland is not and never has been engaged in the business of buying and selling cigarettes. SMK's entire claim is based solely upon communications that went back and forth between Borg and Bartusek. Regardless of whether or not those alleged communications occurred, Sutherland, as principal,

cannot be bound by any actions taken or communications exchanged by its employee, Bartusek, relating to the purchase and sale of cigarettes unless Bartusek had either actual authority, apparent authority, or Sutherland affirmatively ratified his actions. *Anetsberger v. Metro. Life Ins. Co.,* 14 F.3d 1226, 1234 (7th Cir. 1994). None of the foregoing occurred.

### A. Bartusek did not have actual authority to bind Sutherland

In order for SMK to prove that Bartusek had the actual authority to bind Sutherland, it must show that Bartusek had either express or implied actual authority. *Testa v. Emeritus Corp.,* 2015 WL 5183900, at *5 (N.D. Ill. Sept. 4, 2015), (Ex. 1, hereto), citing *Patrick Eng'g, Inc. v. City of Naperville*, 2012 IL 113148, ¶ 34, 976 N.E.2d 318, 329. Express actual authority is granted by the principal explicitly "in very specific or detailed language." *Id.* Implied actual authority exists when an agent acts according to the principal's perceived wishes "based on the agent's reasonable interpretation of the principal's manifestation in light of the principal's objective ..." *Id.*

In this case, Bartusek had neither express nor implied actual authority to bind Sutherland to the sale of cigarettes. Bartusek's express actual authority was set forth in the Board minutes, which stated that he could only bind the company "in furtherance of *its ordinary business purposes* subject to the oversight, direction and control of the Chief Executive Officer. " (Stat. Facts, No. 11). Since Sutherland was not in the business of buying and selling cigarettes in any amount, much less in the amount of $84,000,000, such a transaction could not be considered "in furtherance of ordinary business purposes." (Stat. Facts, No. 8, 25). Consequently, Bartusek did not have actual authority, express or implied, to bind Sutherland to such a transaction. This simple fact was recognized by both Bartusek and Vellodi, who both testified that Bartusek had no authority at all regarding cigarettes. (Stat. Facts, No. 8-10).

### B. Bartusek did not have apparent authority to bind Sutherland

In order for SMK to prove that Bartusek had the apparent authority to bind Sutherland, it must show: 1) that the principal consented to or knowingly acquiesced in the agent's exercise of authority; 2) that based on the actions of the principal and agent, the third person reasonably concluded that the party was an agent of the principal; and 3) that the third person justifiably and detrimentally relied on the agent's apparent authority. *Amcore Bank, N.A. v. Hahnaman-Albrecht, Inc.,* 326 Ill. App. 3d 126, 137-38, 759 N.E.2d 174, 183-84 (2d Dist. 2001).

In proving the first element, only the words and conduct of the alleged principal, not the alleged agent, establish the agent's authority *Curto v. Illini Manors, Inc.,* 405 Ill. App. 3d 888, 896, 940 N.E.2d 229, 236 (3d Dist. 2010). A third party dealing with an agent has the burden of proving the agent's authority to bind the principal to the particular contract on which he rests his claim. *Sacks v. Helene Curtis Industries*, 340 Ill.App. 76, 86, 91 N.E.2d 127, 131 (1st Dist. 1950). This burden is difficult to meet because, where the existence of an agency is an issue, the mere statements of the alleged agent, made outside the presence of the principal and not subsequently approved by him, do not establish the existence of the principal-agent relationship. *Yugoslav-Am. Cultural Ctr., Inc. v. Parkway Bank & Trust Co.,* 289 Ill. App. 3d 728, 735, 682 N.E.2d 401, 406 (1st Dist. 1997). *See Sacks v. Helene Curtis Indus*., 340 Ill. App. 76, 91 N.E.2d 127 (1st Dist. 1950) (in reversing judgment for salesman in action against corporation to recover on alleged oral contract with president providing for compensation based on profits, the court held that the burden was on the salesman to produce by-laws of corporation, or resolution of the board, or other proof of authority on part of the president and in absence of such proof, the plaintiff could not recover).

Under common law, the mere fact that a corporation has the power to make a certain type of contract does not, of itself, clothe even the highest officer of the corporation with the apparent authority to bind the corporation to such a contract. *Corn Belt Bank v. Lincoln Savings & Loan Ass'n,* 119 Ill.App.3d 238, 245, 456 N.E.2d 150 (4th Dist. 1983). Additionally, officers have no apparent authority to make unusual or extraordinary contracts on behalf of a corporation. *See Fritzsche v. LaPlante*, 399 Ill. App. 3d 507, 927 N.E.2d 218 (2d Dist. 2010) (secretary/treasurer of closely held corporation lacked authority to enter into lease with tenant on behalf of corporation where lease involved substantially all of corporation's assets, and therefore, was unusual or extraordinary such that it required board of directors' approval).

In this case, Borg is unable to meet the foregoing elements. Borg could not identify a single employee of Sutherland (other than Bartusek) who led him to believe that Bartusek had authority; in fact, Borg admitted that he never communicated with anyone else at Sutherland who made any representation to Borg regarding Bartusek's alleged authority to buy and sell cigarettes for Sutherland. (Stat. Facts, No. 12). Since Borg, who has the burden of proving Bartusek's authority to bind Sutherland, cannot point to any actions taken by Sutherland that would have led him to believe that Bartusek had authority to bind Sutherland to cigarette sales, his claim fails. Moreover, since Sutherland was not previously engaged in the business of selling cigarettes (which Borg knew) (Stat. Facts, No. 9), *any* purchase and sale of cigarettes by Sutherland was unusual, much less two transactions in excess of $84,000,000. Under these circumstances, no corporate officer, including Bartusek, had apparent authority to make such contracts. SMK's attempt to impose liability on Sutherland merely because Bartusek was its CFO fails as a matter of law.

### B. Sutherland did not ratify Bartusek's actions

Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority. *Charvat v. Valente*, 2015 WL 3575636, at *2 (N.D. Ill. June 8, 2015) (Ex. 2, hereto). A ratification can only occur where a principal had full knowledge and the option of accepting or rejecting the benefits of the unauthorized transaction. *Adams v. Towers, Perrin, Forster & Crosby, Inc.,* 793 F. Supp. 165 (N.D. Ill. 1992). Authority based on ratification must be traceable ultimately to the board of directors, either because the board expressly adopted a transaction, or because it knew or should have known all the material facts and behaved in a way that implied ratification. *Evanston Bank v. Conticommodity Servs., Inc.,* 623 F. Supp. 1014, 1031 (N.D. Ill. 1985).

In this case, there is no evidence that Sutherland ratified Bartusek's actions relating to the cigarettes. When Sutherland's CEO and majority owner, Vellodi, discovered that Bartusek was using Sutherland's facilities in communicating about cigarettes he told him to stop doing that, and Bartusek communicated with his own cell phone and e-mail address thereafter. (Stat. Facts, No. 18). Bartusek admitted that he was attempting to buy and sell cigarettes on his own as a side-business, which did not involve Sutherland. (Stat. Facts, No. 10). Plaintiff has no proof to contradict this sworn testimony, so SMK has no basis to contend that Sutherland ratified Bartusek's actions.

### III. SUMMARY JUDGMENT SHOULD BE ENTERED IN FAVOR OF SUTHERLAND BECAUSE SMK WAS NOT "READY, WILLING AND ABLE" TO PURCHASE THE GOODS IT ALLEGEDLY ORDERED.

A party seeking to recover for breach of contract must show that he has performed or offered to perform his own obligation under the contract or that such performance was excused. *Nation Oil Co. v. R.C. Davoust Co., Inc.*, 51 Ill.App.2d 225, 238, 201 N.E.2d 260, 266 (5th Dist. 1964). Additionally, the non-breaching party must demonstrate that it *could have* performed any

condition precedents to a contract. *Stuart Park Associates Ltd. P'ship v. Ameritech Pension Trust,* 846 F. Supp. 701, 709 (N.D. Ill. 1994). In *CEO Assistance, Inc. v. Calumet Flexicore Corp.,* 1994 WL 176211, at *3 (N.D. Ill. May 6, 1994), (Ex. 1, hereto). summary judgment was entered in favor of the defendant in action seeking broker's commission for sale of business where court found that the potential buyer of the business was not "ready, willing and able" to perform because it was unable to obtain the necessary financing for the purchase.

In this case, Borg testified that SMK did not have the ability to fund the purchases of the cigarettes called for under the two purchase orders. Rather, SMK had to rely on cash from other third-party purchasers to complete any purchase transaction with Bartusek and/or Sutherland. (Stat. Facts, No. 29, 35). Yet Borg could not identify a single, actual purchaser ready, willing and able to fund those large purchases of cigarettes. Borg could only testify that he believed some unidentified overseas buyers who he could not remember, who he never had a contract with, from countries he could not recall, would have purchased the cigarettes if they had been delivered by Sutherland. (Stat. Facts, Nos. 30, 36).

Even if this "make-a-wish" testimony was admissible, which it is not because it is pure speculation, this testimony would not be sufficient to prove SMK could have performed on the delivery dates in July, 2012. To show it *could have* performed, SMK must show that it had *immediate* access to millions of dollars in funds on the alleged delivery dates, not that Borg believes that might have happened. Without being able to identify a single purchaser who had unencumbered funds ready to turn over, SMK cannot prove that it was "ready, willing and able" to perform, and its claims fail as a matter of law.

## IV. THE PURCHASE ORDERS ARE UNENFORCEABLE UNDER SECTION 2-201 OF THE UNIFORM COMMERCIAL CODE

SMK's claim is based on its purchase orders, which state that Illinois law governs the interpretation of the purchase orders even though the alleged purchases and sales were to take place in Cyprus and Dubai. Assuming that was true, the purchase orders are then governed by the Illinois version of the Uniform Commercial Code, which means SMK's claims are barred. Section 2-201 of the Illinois version of the Uniform Commercial Code ("UCC"), 810 ILCS 5/2-201, provides in relevant part as follows:

**Formal Requirements; Statute of Frauds** (1) Except as otherwise provided in this Section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

(2) Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within 10 days after it is received.

A merchant is defined in Section 2-104(1) of the UCC as "a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill." 810 ILCS 5/2-104(1)

The undisputed facts in this case have established that Sutherland is not and never has been engaged in the business of buying and selling cigarettes. Vellodi and Bartusek both testified unequivocally that Sutherland was not in the business of buying and selling cigarettes, and that Bartusek was not authorized to buy and sell cigarettes for Sutherland. (Stat. Facts, 8, 9,

10). Borg admitted that he did not even know when he communicated with Bartusek whether Sutherland had ever previously bought and sold cigarettes. (Stat. Facts, No. 27). Therefore, there is no evidence to establish that Sutherland ever held itself out as a "merchant" of cigarettes under the Uniform Commercial Code. That means for SMK's purchase orders to be enforceable against Sutherland under Section 2-201 of the Uniform Commercial Code, there must be a writing signed by Sutherland. Since there is no such writing, Sutherland is entitled to summary judgment in its favor on Count I of the Second Amended Complaint.

V. **SUMMARY JUDGMENT SHOULD BE ENTERED IN FAVOR OF SUTHERLAND ON THE PURCHASE ORDER DATED JUNE 14, 2012**

Even if this Court denied this motion, partial summary judgment should still be entered against SMK on the June PO because the evidence shows that Sutherland never received the June PO. Borg sent that purchase order to 1150 Victor-Pittsford Road, while Sutherland's actual address is 1160 Victor-Pittsford Road. (Stat. Facts, No. 21). Both Bartusek and his executive assistant, Flanegan, testified they never saw the June PO before this dispute arose. (Stat. Facts, No. 23).

The *only* evidence SMK has regarding Sutherland's receipt of the June PO is Borg's own self-serving testimony that Bartusek supposedly told Borg that the invoice was received. (Stat. Facts, No. 25). However, Borg's testimony as to what Bartusek said about the June PO is hearsay evidence that is inadmissible against Sutherland. In order for an agent's statement to be admissible as a "vicarious admission of a party opponent," the party offering the statement must lay the following foundation for its introduction: (1) the person who made the statement was an agent or employee; (2) the statement was made about a matter over which he had actual or apparent authority; and (3) he spoke by virtue of his authority as such agent or employee. *Id.* at 9-10. In considering whether a statement is by a party's agent or servant and concerns a matter

within the scope of the agency or employment, made during the existence of the relationship, so as to be admissible as party admission, the court must determine if the employee was authorized by the employer regarding the matter about which the employee allegedly spoke. Fed.Rules Evid. 801(d)(2)(D); *Stagman v. Ryan*, 176 F.3d 986, 996 (7th Cir. 1999).

As set forth at length above, in this case, Bartusek did not have actual or apparent authority to sell cigarettes on behalf of Sutherland. As such, Borg's testimony about what Bartusek told him on any issue involving cigarettes is inadmissible against Sutherland. Of course, SMK could ask Bartusek at trial whether Bartusek received the June PO, but that evidence will do SMK no good since Bartusek denies ever receiving the June PO or telling Borg that it was received. But since Borg's testimony as to what Bartusek said about the June PO is inadmissible against Sutherland, summary judgment must be entered in Sutherland's favor on that purchase order because there will be no evidence that it was received, and since it was not even mailed to the correct address, there is not even a presumption that it was received. *Terazov v Gonzales,* 480 F. 3rd 558, 656 (7th Cir. 2007) (no presumption of receipt when document mailed to an incorrect address).

## Conclusion

Based on the foregoing, Defendant, Sutherland Global Services, Inc., requests this Court to enter summary and final judgment in its favor, and against Plaintiff, SMK Associates, LLC, on Count I of SMK Associates, LLC's Second Amended Complaint, plus award it its costs and such additional and further relief as this Court deems appropriate.

| | |
|---|---|
| Mark E. Shure (6188755) | **SUTHERLAND GLOBAL SERVICES, INC.** |
| **Latimer LeVay Fyock LLC** | |
| 55 W. Monroe St., Ste. 1100 | By:   /s/ Mark E. Shure |
| Chicago, IL 60603 | Its Attorney |
| (312) 422-8000 (tel); (312) 422-8001 (fax) | |
| mshure@llflegal.com | |