IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SMK Associates, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.: 1:14-cv-00284 |
| | ) | |
| Sutherland Global Services, Inc., | ) | |
| and Michael Bartusek, | ) | Hon. Judge John Z. Lee |
| | ) | Magistrate Judge Jeffrey Cole |
| Defendants. | ) | |

**[PUBLIC REDACTED VERSION]**
**PLAINTIFF SMK ASSOCIATES, LLC'S MEMORANDUM IN OPPOSITION TO**
**SUTHERLAND GLOBAL SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT**

Derek Y. Brandt, Esq.
derek@brandtlawllc.com
BRANDT LAW LLC
P.O. Box 487
Edwardsville, Illinois 62025
Tel: 618-307-6116

Dated: December 8, 2015          *Counsel for SMK Associates, LLC*

INTRODUCTION AND FACTUAL BACKGROUND

In February 2012, the Chief Financial Officer of Sutherland Global Servies—a company of 40,000 employees with operations in 18 countries—contacted SMK and offered that Sutherland could supply SMK with any quantity and brand of tobacco product. Plaintiff's Local Rule 56.1(b) Statement of Additional Facts (hereafter "LR56.1(b) Facts"), at 40. The CFO, Michael Bartusek, described Sutherland as active in many different industries, and he convinced SMK's principal, Martin Borg, that he had done his research and was quite knowledgeable about secondary market tobacco products and escrow transactions conducted at bonded, duty-free warehouses. LR56.1(b) Statement at 54-55. Bartusek told Borg, among other things, that Sutherland was purchasing goods directly from Philip Morris. *Id.*

Bartusek and Borg spent several months working towards consummating tobacco procurement agreements. Bartusek regularly wrote to Borg from his Sutherland email address and he represented to Borg that he was transacting business on behalf of Sutherland. LR56.1(b) Facts at 40, 54, 55. Ultimately, Borg and Bartusek negotiated and reached agreement on two transactions, one in June 2012 and one in July 2012. *Id.* at 46-50. The first involved one year's worth of monthly deliveries by Sutherland, to a bonded warehouse at the port in Cyprus—Bartusek described Limassol, Cyprus as a "preferred" Phillip Morris port—of specified types and quantities of Swiss Philip Morris cigarette "master cases," all at agreed-upon pricing and agreed terms and conditions. *Id.* at 46-49. The second agreement involved Sutherland's delivery at a bonded warehouse in Dubai—a city where Sutherland has operations—of different cigarette master cases. *Id.* at 50, 41. Both agreements were to be carried out as escrow transactions, with payment to the bonded warehouse as escrow agent after successful inspection. Id. at 47; *see also* SMK's Response to Sutherland's LR56.1(a) Statement (hereafter "LR56.1(a) Response"), at 19.

After each agreement was reached, Borg prepared a purchase order ("PO") confirming the agreed terms and sent that purchase order to Sutherland. LR56.1(b) Facts at 49; LR56.1(a) Response at 20, 31. Sutherland acknowledges receipt of the July PO. LR56.1(a) Statement at 32; LR56.1(b) Facts at 51. Although Bartusek telephonically acknowledged receipt of the June PO, he (and Sutherland) now claim that it was never received. LR56.1(b) Facts at 51. Sutherland did not deliver the cigarettes that were the subject of the two agreements. *See id.* at 52.

At the same time as these negotiations, Bartusek ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See generally* LR56.1(b) Facts at 56-63. He regularly ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 57-58. Bartusek ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* at 57. And, time and again, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* at 59. Most importantly, Bartusek ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* at 58, 60, 70.



Despite all this, Sutherland moves for summary judgment under the contention that Bartusek never had any authority to engage in this campaign. Bartusek was one of the top 3-4 officers at Sutherland and was a company "signatory" (although Sutherland pretends there is no such thing). In light of this and all the foregoing, any suggestion that he lacked actual authority surely is at the very least a question to be resolved by the trier of fact. Further, Sutherland has

known about all of this since *before* the two transactions with SMK even were agreed-to, but it chose to take no meaningful actions to rectify or prevent what followed. Only after SMK pressed Sutherland's non-performance under the agreements did Bartusek suddenly begin to toe the company line and agree that he lacked authority (past conduct notwithstanding). Sutherland now relies heavily on this incredible and inescapably biased testimony. But Borg disputes it, and Sutherland's own documents belie the Sutherland/Bartusek position. Summary judgment therefore should be denied. The rest of Sutherland's motion fares no better: the POs confirmed the terms of the agreements and, as between merchants, they satisfy the Statute of Frauds when not objected to within ten days. Sutherland acknowledges receipt of the July PO and so has no defense there; a jury may reasonably conclude that Sutherland likewise received the June PO. Finally, Sutherland's throw-away argument about failure of conditions precedent has no application to this situation.

The Court should deny Sutherland's motion in its entirety.

## APPLICABLE LEGAL STANDARD

Summary judgment is appropriate where there are no genuine issues of material fact and where the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Thus, summary judgment is granted "if no rational jury could, on the evidence presented in the summary judgment proceeding, bring in a verdict for the party opposing summary judgment." *Mills v. First Fed. Sav. & Loan Ass'n of Belvidere*, 83 F. 3d 833, 846 (7th Cir. 1996). Summary judgment is inappropriate when there is a dispute over the facts which might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

3

ARGUMENT

I. **A jury could reasonably find that Bartusek had authority to engage in the agreements that were confirmed by the June and July Purchase Orders**

Sutherland argues that it is entitled to summary judgment because Bartusek had no authority to enter into the transactions at issue in this case. Bartusek, however, was a Sutherland Authorized Signatory and Sutherland, in any event, ratified his conduct. Accordingly, whether or not Bartusek had authority is a question of fact that cannot be resolved in Sutherland's favor on summary judgment.

   **A. Bartusek was a Sutherland Authorized Signatory**

As Sutherland CFO, Bartusek was one of the top three or four officers in a sweeping global enterprise of more than 40,000 employees, with responsibilities that included "legal, corporate development, [and] strategy." LR56.1(b) Facts at 43. No one denies that Bartusek periodically signed contracts in his role as Sutherland CFO. LR56.1(b) Facts at 43, 45. Indeed, Bartusek was what Sutherland refers to in corporate documents as an "Authorized Signatory." Sutherland's Chief Operating Officer Ashok Jain ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and Bartusek's own executive assistant Kelley Flanegan likewise understood Bartusek to be a "company signatory." LR56.1(b) Facts at 45. Sutherland's Code of Conduct and Business Ethics references the company's "Authorized Signatory Policy," but despite this and despite the testimony described above, Sutherland disputes the existence of such a policy. Incredibly, Vellodi claimed that this is not a term that is used at Sutherland. LR56.1(b) Facts at 44. However, a "matrix" of signatory authorities ultimately produced by Sutherland belies this argument. In fact, the Sutherland CFO is designated ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. LR56.1(b) Facts at 45.

4

Sutherland relies entirely on the vanilla content of minutes from a 2008 board of directors meeting to argue that Bartusek lacked authority. *See* LR56.1 Statement at 11. But this boilerplate provision amounts to little more than the circular statement that Bartusek had authority to do those things for which he had authority. A corporation acts through its officers and, while authority levels may vary, a corporate officer "must have the authority to bind the corporation." *Velsicol Chem. Corp. v. Parsons*, 561 F. 2d 671, 674 (7th Cir. 1997). As one of the top officers at a major corporation involved in operations around the globe and as a company "signatory," the trier of fact could reasonably conclude that Bartusek in fact had authority to engage in the transactions at issue in this case.

### B. Sutherland and Bartusek's coordinated testimony to the contrary is not credible

As described above, Vellodi's testimony about Bartusek's authority is not credible and is contradicted by Sutherland's own documents. To bolster its argument, Sutherland accordingly hangs its hat on Bartusek's own testimony. But Bartusek is not credible on any score and, in any event, his testimony too is directly contradicted by Sutherland's own documents as well as by Borg's testimony—leaving the quintessential question of fact for the jury. *See Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704-05 (7th Cir. 2011) ("district courts presiding over summary judgment proceedings may not weigh conflicting evidence, or make credibility determinations, both of which are the province of the jury") (internal quotation marks and citations omitted); *Russell v. Bd. of Trs. of Univ. of Ill. At Chi.*, 243 F.3d 336, 340 (7th Cir. 2001) ("Not surprisingly, Margherone recalls these events differently but summary judgment is a singularly inappropriate time to resolve a 'he said, she said' kind of dispute.").

Sutherland relies on Bartusek for every element of its argument: it argues that Bartusek testified that Sutherland was not in the tobacco business; that he acknowledges having no

5

authority; and that he never told Borg that he was operating on behalf of Sutherland or that Sutherland would be involved in the transactions. Borg testified directly to the contrary. LR56.1(a) Response at 8, 9, 10, 12; LR56.1(b) Facts at 40, 54. On this record, Sutherland cannot prevail on summary judgment. *Russell*, 243 F. 3d at 340.

Sutherland's own documents, moreover, fatally undermine Bartusek's (and thus Sutherland's) credibility. In fact, Sutherland documents establish unequivocally that ████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████. LR56.1(b) Facts at 56-63. It is beyond dispute that Bartusek communicated regularly from his Sutherland email and from the Sutherland offices, both with SMK ████████████████████████████████████████████████████████████ ████ But the evidence shows far more. Sutherland documents confirm ████████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ████. LR56.1(b) Facts at 70. Sutherland documents demonstrate ████████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████. LR56.1(b) Facts at 56-60.

Bartusek ████████████████████████████████████████████████ ████████████████. LR56.1(b) Facts at 57. More telling yet, ████████████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████. LR56.1(b) Facts at 57, 58, 62. Sutherland, accordingly, ████████████████████████████████████████████, *see* LR56.1(b) Facts at 58, 60, 61,



6

63, and its claims never to have been involved in the tobacco business must be rejected. *See also* LR56.1(a) Response at 8. It is an inescapable conclusion that ███████████████████████████████████████████████████████████ in light of Borg's consistent testimony, a jury could reasonable infer and find that he made comparable representations to SMK even though he now denies this.[1]

Even if all of this were not sufficient (and it is), the trier of fact could reasonably decide that Bartusek is also not credible because of bias. Even crediting Sutherland's dubious claim that it "discovered" Bartusek's conduct in May 2012, it is undisputed that Bartusek was allowed to remain as CFO of this global enterprise for another *twenty-eight* months, until September 30, 2014. LR56.1(a) Statement at 3. During this entire duration, ███████████████████████████████████████████. LR56.1(b) Facts at 71. And, for reasons unknown and contrary to what might be expected if Sutherland's version of events were accurate, Sutherland has not sued Bartusek even though ███████████████████████████████████████████████████████████████████████████████. LR56.1(b) Facts at 70. A jury could reasonably infer that Bartusek's testimony toeing the company line has been pervaded by his bias due to these facts.

### C. A jury could reasonably find that Sutherland ratified Bartusek's actions

Even if a jury concluded that one of the "top 3 or 4" officers at a 40,000 employee company, who also was a corporate "signatory," lacked actual authority to enter into the agreements at issue here, it could reasonably infer that Sutherland ratified the conduct.

---

[1] Even if SMK and Borg did not know the specifics of ███████████████████████████████████████████ the course of dealing between the parties will support a reasonable inference that Borg knew Bartusek was dealing with *some* other suppliers. And, the critical import is that Bartusek's actions in this regard completely impugn any credibility on his part in the testimony on which Sutherland so heavily relies.

Sutherland argues that it "discovered" Bartusek's conduct in "late May 2012." The evidence suggests Vellodi knew no later than *early* May 2012, LR56.1(a) Response at 18, but this is a minor quibble; either way, Vellodi knew well before either of the agreements at issue in this case were consummated.

In fact, before either of these agreements were consummated, Vellodi knew ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. LR56.1(b) Facts at 64. Vellodi also knew, or had available to him, ███████████████████████████████████████████████████, including SMK. *Id.* A reasonable investigation after this "discovery" would have shown that Bartusek was engaging in this conduct at least as far back as early 2011. LR56.1(b) Facts at 67. And, despite the seriousness of a "discovery" such as this, and despite having access to Bartusek's Sutherland email, Vellodi neither himself ███████████████████████████████████████████████████████████████████████. LR56.1(b) Facts at 69.[2] Nor did Vellodi ███████████████████████████████████████████████. *Id.* He did not, for instance, ███████████████████████████████████████████████████. *Id.* ███████████████████████████████████████, but Flanegan denies that this instruction was given. *Id.* Either way, a jury may reasonably infer that ███████████████████████████████████████ does not demonstrate a serious response to a situation that would seem to call for one in light of Vellodi's "discovery."

---

[2] Bartusek never did so either, and never alerted Borg or SMK to any purported problem with Vellodi. LR56.1(b) Facts at 69.

Whether or not the instruction to Flanegan was given, the purpose went unserved. Flanegan saw subsequent Bartusek communications regarding tobacco procurement, but did not alert Vellodi. LR56.1(b) at 68. As discussed below, Bartusek later consummated the two Sutherland agreements with SMK, one of the entities which Vellodi could have warned off had Sutherland truly not been involved and had he chosen to take action. Flanegan acknowledges that Sutherland received the July PO and acknowledges noting that it had come from SMK; even so, she did not alert Vellodi to this. LR56.1(b) Facts at 68.

For his part, even after both the June PO and the July PO had issued, Bartusek  LR56.1(b) Facts at 63. He *Id.*; LR56.1(b) Facts at 68. *See also id.* at 61 (referencing ). Bartusek remained CFO of Sutherland for well over two more years.

Against this factual record, it strains credulity to believe that Sutherland only "discovered" some surprise tobacco efforts by Bartusek in May 2012. But even if a jury could believe that, such a jury also reasonably could conclude that what Vellodi apparently chose to do (or not to do) in response to that discovery amounts to ratification of Bartusek's conduct.

**II. Sutherland's non-performance is not excused by the failure of any "condition precedent"**

Sutherland argues that it is entitled to summary judgment because SMK was not "ready, willing and able" to purchase the goods, but this entire argument rests on a false foundation. Initially, Sutherland argues that a party must show that it has performed or offered to perform under the contract in order to recover in breach, Mem. at 11 (citation omitted), and this is not

9

controversial. But Sutherland's argument leaves the rails when it next asserts that SMK must demonstrate that it could have performed any *condition precedent* to the contract. *Id.* at 11-12 (emphasis added). The cases Sutherland cites in support are clear that they deal with conditions precedent to a contract, and not more generally with performance under the contract. *Stuart Park Associates Ltd. P'ship v. Ameritech Pension Trust*, 846 F. Supp. 701, 709 (N.D. Ill. 1994), says just this: "Under the [specific contract], the plaintiffs were required to secure construction financing before November 30 as a *condition precedent* to any investment by the defendants." 846 F. Supp. at 709 (emphasis added). By contrast, the SMK-Sutherland agreements contemplated no pre-contract financing contingency or other conditions precedent as to which SMK could not perform. Sutherland imports into its argument a supposed "ready, willing and able" requirement from *CEO Assistance, Inc. v. Calumet Flexicore Corp.*, 1994 WL 176211, at *3 (N.D. Ill. May 6, 1994), but that has no application here. *CEO Assistance* makes clear that this requirement applies to a broker's right to receive a commission. 1994 WL 176211, at *2 ("If a broker, employed by the owner to sell property produces a *ready, willing and able* purchaser agreeing to purchase the property *on the terms prescribed by the seller*, the broker is entitled to a commission even if the seller refuses to perform the contract." (Citations omitted, emphasis in original)). Unlike *CEO Assistance*, this case does not involve a non-exclusive brokerage agreement conditioned on finding an ultimate purchaser with sufficient financing. What Sutherland is really saying (unlike the cases it cites) is that *had it performed*, then it expects that SMK would have breached. And it is true that because SMK's written confirmation of the June and July POs was sufficient against SMK, pursuant to 810 ILCS 5/2-201, *had Sutherland delivered the cigarettes* SMK would have been required to perform, against pain of its own

breach of contract.[3] But this is different than failure of a condition precedent, and it is not what happened here. Sutherland is not entitled to summary judgment on that basis.

### III. The June and July Purchase Orders confirm agreements reached between merchants and, under the UCC, satisfy the requirements of Section 2-201

#### A. The parties entered into agreements, confirmed by the POs

Sutherland argues that SMK's claim "is based on its purchase orders." Mem. at 13. In fact, Sutherland's claim is based on breach of agreements reached between the parties that were confirmed by the purchase orders. The parties' relationship began when Bartusek phoned SMK in February 2012 and told Borg that Sutherland was active in many different industries, was establishing itself in tobacco, and would be able to supply any quantity and any brand of tobacco product. LR56.1(b) Facts at 40. The parties negotiated and prospected for available product and pricing for several months before Bartusek acknowledges that they were working on "something big" in May 2012 with respect to a Philip Morris deal. LR56.1(b) Facts at 46. By June 12-13, 2012, the parties agreed on pricing and volume for a Cyprus port transaction which contemplated delivery of ten containers per month for a year. They had already agreed on the other terms and conditions of the deal, including a 10% penalty provision for non-delivery. LR 56.1(b) at 47-49. Borg prepared the June PO and mailed it to "Mr. Michael Bartusek, Sutherland Global Services, Inc., 1150 Pittsford Victor Road, Pittsford, NY 14523." LR56.1(b) Facts at 49; Second Am. Compl., Ex. M. Bartusek confirmed by phone that he had received the June PO. Borg and Bartusek continued to discuss telephonically and in text messages the Cyprus transaction and the status of the "Swiss product" it contemplated. LR56.1(b) Facts at 51-52. When Sutherland had not delivered the cigarettes, Bartusek agreed that it needed to pay the 10% penalty. LR56.1(b)

---

[3] SMK believed that it had adequate subscription of end purchasers to perform the agreements or that it would otherwise have been able to perform by financing the purchases. *See* LR56.1(a) Response at 30, 36.

11

Facts at 52. At one point, Borg related via text message that he had not received the wire transfer and requested the confirmation number. *Id.* Bartusek did not respond to dispute the existence of an agreement, to dispute that the June PO had not been received, to dispute that there was a failure of delivery, or that there had been discussion of a wire transfer to settle the penalty. Although Sutherland disputes (and Bartusek *now* disputes) those points, on July 20, 2012 Bartusek said simply "Won't be able to do anything until I have to [*sic*] product then we can square up." *Id.*

In July 2012, the parties agreed to terms for a transaction to take place at a bonded warehouse in Dubai. LR56.1(b) Facts at 50; *see also id.* at 46-49. Borg prepared a confirming purchase order (the July PO), and mailed it, in the same manner and using the same address, to Bartusek at Sutherland. LR56.1(a) Response at 31. Bartusek confirmed receipt of the July PO by phone and the record of text messages between the parties demonstrates their continuing discussion as to the status of the Dubai product. LR56.1(b) Facts at 51. Flanegan confirms that Sutherland received the July PO. LR56.1(a) Statement at 32; LR56.1(b) Facts at 68.

To be sure, Sutherland and even Bartusek dispute some of Borg's testimony. But those disputes are inappropriate for disposition on summary judgment. *Russell*, 243 F.3d at 340. Moreover, as discussed above, *see supra* at Point I.B., Bartusek's credibility is especially questionable. SMK is entitled to all reasonable inferences from the evidence presented. Based on that evidence, a jury could reasonably conclude that agreements were reached as Borg describes.

**B. The POs were sufficient as between merchants**

As Sutherland acknowledges, Mem. at 13, even where there is not a writing signed by both parties, the Statute of Frauds can be satisfied by "a writing in confirmation of the contract and sufficient against the sender" where it is between "merchants" and written notice of

12

objection is not made within 10 days. 810 ILCS 5/2-201(2). A merchant is "a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction." 810 ILCS 5/2-104(1). The only argument that Sutherland makes on this score is its assertion that the "undisputed facts" establish that Sutherland "is not and never has been engaged in the business of buying and selling cigarettes." Mem. at 13. Not so.

As discussed above at Point I.B., *supra*, Sutherland ████████████████████████████████████████████████████████████████████████. *See also* LR56.1(b) Facts at 58-63. It is undisputed that Sutherland ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. *See id.* at 56-63. It is also beyond dispute that Bartusek held Sutherland out as such to SMK. LR56.1(b) at 40, 54-55. Bartusek demonstrated deep knowledge about transactions in tobacco products, secondary markets, bonded warehouses for duty free goods, and the like. *Id.* He told Borg that Sutherland was dealing directly with Philip Morris. *Id.* He knew of Limassol, Cyprus as a "preferred" Phillip Morris port. LR56.1(b) Facts at 46. He was knowledgeable about letter of credit and escrow transactions and about available third-party inspection services. LR56.1(b) Facts at 55. In short, Bartusek held out Sutherland as knowledgeable about tobacco products and the secondary markets practices, which is precisely what makes a merchant for the UCC.

Sutherland argues that Borg did not know whether or not Sutherland had ever bought or sold cigarettes. While that may have been true in February 2012, by May Borg knew that Sutherland had bought cigarettes. *See* LR56.1(a) Response at 13. Borg could reasonably have believed as much even earlier, as Sutherland is a company of some 40,000 employees, with

13

subsidiaries and operations "around the globe." LR56.1(b) Facts at 41. Sutherland's operation is so immense that even its founder, majority owner, and CEO "could not tell" and "dare[d] not guess" how many subsidiaries it actually has. *Id.* It operates in 18 different countries and has operations in Dubai—the location where the tobacco deliveries confirmed by the July PO were to have been made. *Id. See also* Second Am. Compl., Ex. N. Bartusek's ▮▮▮▮▮ ▮▮▮▮▮ only lend credence to this. And, again: ▮▮▮▮▮▮▮▮▮▮. Sutherland and Bartusek may dispute some of Borg's testimony, but such a dispute does not entitle Sutherland to summary judgment that it is not a merchant, particularly in light of Bartusek's credibility deficit.[4]

A jury could also reasonably conclude that the June and July POs were received by Sutherland, thus fully satisfying the Statute of Frauds (as Sutherland does not contend that it made written objection within 10 days). Sutherland acknowledges that the July PO was received and so there is no issue as to that PO. LR56.1(a) Statement at 32; LR56.1(b) Facts at 51. The June PO was, in the same manner, put in the U.S. mails, postage prepaid, and addressed to the same address used in the July PO. LR56.1(a) Response at 20, 31; LR56.1(b) Facts at 49. The law recognizes a presumption of receipt when the correspondence has been placed in a properly addressed envelope with adequate postage affixed and deposited in the mail. *First Nat. Bank of Antioch v. Guerra Const. Co., Inc.*, 153 Ill.app.3d 662, 667, 505 N.E.2d 1373, 1376 (2d Dist. 1987); *see also Byington v. Dept. of Agriculture*, 327 Ill.App. 3d 726, 732-33, 764 N.E.2d 576, 582 (2d Dist. 2002). Specific evidence of mailing adequate to satisfy this presumption exists here, *see* LR56.1(a) Response at 20, LR56.1(b) Facts at 49, except for the fact that the June PO was addressed to *1150* Pittsford Victor Road, rather than to the proper address of *1160* Pittsford Victor Road. *Id.* Nonetheless, Bartusek telephonically acknowledged receipt of the June PO,

---

[4] Sutherland does not argue that SMK is not a merchant, but the evidence would support such a finding anyway. *See, e.g.*, LR56.1(b) Facts at 53.

14

LR56.1(b) Statement at 51, and this is the same (ever-so-slightly-wrong) address that was used for the July PO, as to which Sutherland acknowledges receipt.[5] Weighing all of this, a jury reasonably could conclude that the June PO was actually received by Sutherland.

IV.  **Sutherland is not entitled to summary judgment on the agreement confirmed by the June Purchase Order**

Sutherland's final argument is that it is entitled to summary judgment "on the purchase order dated June 14, 2002." Mem. at 14. Sutherland argues that the only evidence that the June PO was received is Borg's testimony about what Bartusek told him, and that this is unreliable, disputed, or inadmissible against Sutherland. *Id.*

As discussed above, however, there also exists evidence of continuing written discussions between Borg and Bartusek about the subject of the June PO, LR56.1(b) Facts at 51-52, from which a jury reasonably could conclude that the June PO was received by Sutherland. For all these reasons, as well as the reasons discussed in the preceding Point III.B., a jury may reasonably conclude that the June PO was received by Sutherland and summary judgment therefore is inappropriate.

CONCLUSION

For the foregoing reasons, the Court should deny Sutherland's motion for summary judgment in its entirety.

Dated: December 8, 2015                      BRANDT LAW LLC

                                             */s/ Derek Y. Brandt*

---

[5] *Terezov v. Gonzalez*, 480 F. 3d 558 (7th Cir. 2007), cited by Sutherland, is inapposite for evaluating presumption of receipt. In that case the court assessed under federal statutory law the sufficiency of a DHS notice. This Court may also take judicial notice of maps demonstrating that these two addresses appear to be within a single building or compound. *See Radogno v. Illinois State Bd. of Elections*, 836 F.Supp.2d 759, 772 n.8 (N.D. Ill. 2011).

15

Derek Y. Brandt (#6228895)
P.O. Box 487
Edwardsville, Illinois 62025
618-307-6116
derek@brandtlawllc.com

*Counsel for SMK Associates, LLC*

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 8th day of December, 2015, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon the following, and was also served via email on Michael Bartusek at the email address specified below.

Mark E. Shure, Esq.
Susan A. Stoddard, Esq.
Latimer LeVay & Fyock LLC
55 W. Monroe Street, Suite 1100
Chicago, Illinois 60603
Tel: 312-422-8000
mshure@llflegal.com

Michael Bartusek (*Pro Se*)
15 Emerald Hill Circle
Fairport, New York 14450
mikebtext100@gmail.com

*Counsel for Sutherland Global Services, Inc.*

/s/ Derek Y. Brandt