IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SMK ASSOCIATES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | 14 C 284 |
| | ) | |
| v. | ) | Judge John Z. Lee |
| | ) | |
| SUTHERLAND GLOBAL | ) | |
| SERVICES, INC., and MICHAEL | ) | |
| BARTUSEK, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff SMK Associates, LLC, filed suit against Sutherland Global Services, Inc., alleging that Sutherland breached two contracts agreeing to sell SMK $84 million worth of tobacco products. SMK also sued Sutherland's former Chief Financial Officer, Michael Bartusek, the person with whom it had negotiated the contracts, asserting claims of breach of contract and fraud against him individually. Sutherland filed a motion for summary judgment, arguing that Bartusek acted of his own accord and not as its agent when agreeing to these contracts. For the reasons stated herein, the Court denies Sutherland's motion.

## Factual Background

SMK Associates is an Illinois limited liability company whose sole member is Martin Borg. *See* Def.'s LR 56.1 Stmt. ¶ 1, ECF No. 101. Sutherland is a New York corporation that acts as a business outsourcing company for multinational corporations. *See id.* ¶¶ 2, 8. Michael Bartusek was the Chief Financial Officer of Sutherland from June 2007 to September 30, 2014. *See id.* ¶ 3.

In this particular case, SMK was contacted via email by Bartusek in February 2012 with an offer to sell SMK a large quantity of cigarettes. *See id.* ¶ 13. The parties initially signed a "Non-Circumvention Agreement" that Bartusek signed under the name "Kikki Distributors," an entity not associated with Sutherland. *See id.* ¶¶ 14, 16. Borg contends that Bartusek told him that Kikki Distributors was a subsidiary of Sutherland. *See id.* ¶ 15. Bartusek, on the other hand, denies ever making that representation and testified that it was a company that he made up to buy and sell cigarettes. *See id.* ¶ 16. Bartusek also personally signed a nondisclosure and non-compete agreement sent to him by SMK. *See id.* ¶ 17.

By May 2012, Borg and Bartusek were working on a big sale of cigarettes. *See* Pl.'s LR 56.1 Addt'l Stmt. ¶ 46, ECF No. 116. SMK subsequently sent two Purchase Orders, totaling $84,000,000, to Bartusek at his Sutherland office, in June and July 2012. *See* Def.'s LR 56.1 Stmt. ¶¶ 20–21, 31. Both Purchase Orders contained a clause asserting a ten percent penalty to be paid if the Purchase Orders were not fulfilled in a timely manner. *See id.* ¶¶ 21, 31. Upon receipt of the July 2012 Purchase Order, which was for $2,880,000, Bartusek's executive assistant Kelley Flanegan noted that it was the largest invoice or Purchase Order she had ever seen. *See id.* ¶ 32.

SMK asserts that it was under the impression that the agreements had been made with Sutherland as opposed to with Bartusek in his individual capacity. Bartusek had initially corresponded with SMK using his Sutherland email address and phone number. *See id.* ¶ 13. Furthermore, in addition to communicating with

2

SMK about procuring tobacco, Bartusek had similarly contacted other entities regarding the possible procurement of cigarettes. *See* Pl.'s LR 56.1 Addt'l Stmt. ¶ 56. In his interactions with these other entities, Bartusek used the Sutherland name and even caused Sutherland to make payments for warehouse inspections of tobacco. *See id.* ¶ 60.

Bartusek, in his role as CFO, was an authorized signatory for the company, which permitted him to sign various agreements on the company's behalf. *See* Def.'s LR 56.1 Stmt. ¶ 11. The Board minutes establish that this signatory authority could bind Sutherland only if the signed document was "in furtherance of its ordinary business purposes." *See id.* As of 2013, Bartusek was authorized by Sutherland to execute various routine contracts such as nondisclosure agreements, technology-related purchases, and leases. *See* Pl.'s LR 56.1 Ex. E, ECF No. 118.

In May 2012, when Sutherland's CEO discovered that Bartusek had been engaging in the procurement of cigarettes and was using Sutherland's facilities to do so, he asked Bartusek to stop using the company's offices and telecommunication systems to conduct this side business. *See id.* ¶ 18. Sutherland has never been in the business of buying or selling tobacco, nor is it in the business of buying or selling any goods. *See id.* ¶ 8.[1]

---

[1] SMK disputes this description of Sutherland's business and points to Bartusek's dealings as proof that Sutherland was, in fact, in the cigarette business. *See* Pl.'s Resp. 56.1 Stmt. ¶ 8. But, as we shall see, this argument is circular, basically contending that the Court should find that Bartusek was acting as Sutherland's agent because Sutherland is in the business of selling cigarettes, and that Sutherland was in the cigarette business because Bartusek was selling cigarettes.

## Legal Standard

The Court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court gives "the non-moving party the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013). In order to survive summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "must establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor," *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

## Analysis

### I. Bartusek's Authority

In order for SMK to prevail on its breach of contract claim against Sutherland, it must prove that Bartusek had the necessary authority to bind Sutherland to the agreements with SMK. For an agent's actions to bind the principal, the agent must have either actual authority, apparent authority, or the principal must ratify the agent's actions. *See Anetsberger v. Metro. Life Ins. Co.*, 14 F.3d 1226, 1234 (7th Cir. 1994). Sutherland argues in its motion for summary judgment that Bartusek did not have any authority to bind Sutherland to the contract with SMK. SMK argues the opposite. The burden of proving the existence and scope of an agency relationship is on SMK as the party seeking to charge the

principal with the purported agent's actions. *See Yugoslav-Am. Cultural Ctr., Inc. v. Parkway Bank & Trust Co.*, 682 N.E.2d 401, 406 (Ill. App. Ct. 1997).[2]

The Court need not address the first two forms of authority because there is a triable issue of fact as to whether Sutherland ratified the tobacco contracts. Ratification occurs when a principal affirms the act of another party, binding the principal to that act even if the agent had acted without authority prior to the ratification. *Lydon v. Eagle Food Ctrs., Inc.*, 696 N.E.2d 1211, 1216 (Ill. App. Ct. 1998). A principal is bound by ratification only if the ratification is made with full knowledge of the material facts, unless the principal explicitly chose to ratify knowing that full knowledge was lacking. *Id.*

In May of 2012, Sutherland's CEO became aware that Bartusek was involved in buying and selling tobacco. *See* Pl.'s LR 56.1 Addt'l Stmt. ¶ 64. Bartusek and the CEO had a meeting during which Bartusek acknowledged that he had used Sutherland funds to purchase tobacco products in the past. *See id.* The CEO told Bartusek, under threat of termination, that he could not conduct the business from Sutherland's offices or computers. *See* Def.'s LR 56.1 Stmt. ¶ 18 (disputed by SMK on other grounds). The CEO then asked Flanegan—Bartusek's administrative assistant who had brought the issue to his attention—to monitor Bartusek's activities and tell the CEO if she observed tobacco-related activities. *See* Pl.'s LR 56.1 Addt'l Stmt. ¶ 67. Although Flanegan remembers receiving the June purchase order from SMK, she testified that she did not notice it was for tobacco and thus did

---

[2] Both parties rely upon Illinois law in this dispute, and neither suggests that any other state law should apply, so the Court will apply Illinois law as well.

not report it to the CEO. *See* Def.'s Resp. Pl.'s LR 56.1 Addt'l Stmt. ¶ 67, ECF No. 127.

"Although normally a principal's actual knowledge of the transaction is essential in determining ratification, one whose ignorance or mistake was the result of gross or culpable negligence in failing to learn the facts will be estopped as if he had full knowledge of the facts." *Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*, 376 F.3d 664, 678 (7th Cir. 2004). Here, the circumstances are sufficient for a reasonable juror to find that the company was negligent in failing to investigate and further monitor Bartusek. After the May 2012 meeting, the company was aware of Bartusek's tobacco-related activities, including the fact that he had used nearly $600,000 of Sutherland's money to run his tobacco business. Moreover, Bartusek's administrative assistant was tasked with monitoring him and saw one of the purchase orders at issue in this case. Thus, taking all inferences in SMK's favor, as the Court must do at this stage, a genuine issue of fact exists as to whether Sutherland was grossly negligent in failing to prevent Bartusek's actions that are the subject of this case.

## II. SMK's Readiness and Willingness to Perform

Sutherland next argues that, even if Bartusek had the necessary authority to enter into the contracts, SMK was not ready and willing to perform its portion of the contracts.

The contracts in this case both indicated that payment was due after inspection—which was to occur in Dubai in one contract and Cyprus in the other. *See* Def.'s LR 56.1 Stmt., Ex. 1 2nd Am. Compl., Ex. M & N Purchase Orders. The

tobacco was never delivered for inspection and, when contacted, Sutherland disavowed the existence of the contracts between it and SMK. *See* Def.'s LR 56.1 Stmt., Ex. 1 2nd Am. Compl., Ex. O.

As an initial matter, the parties dispute whether Illinois contract law requires SMK to show that it could have performed its part of the contract had Sutherland delivered the tobacco. *See* Def.'s Mem. Supp. SJ at 11–12, ECF No. 100; Pl.'s Mem. Opp. SJ at 9–11, ECF No. 115; *see also Stuart Park Associates Ltd. P'ship v. Ameritech Pension Trust*, 846 F. Supp. 701, 709 (N.D. Ill. 1994) ("Defendants correctly counter that, be that as it may, to recover for breach of contract the non-breaching party must nonetheless demonstrate that it *could have* performed the condition."). Whether or not SMK has to show readiness and willingness under Illinois law, Borg's testimony suggests that he did in fact have buyers to whom he could have sold the tobacco.

During Borg's deposition he is asked who would have purchased the tobacco had Sutherland delivered it—in other words, who would have given SMK the funds necessary to turn around and pay Sutherland what it was owed. Borg explained that he had compiled a list of people he had spoken to who were willing to buy the tobacco. *See* Def.'s LR 56.1 Stmt., Ex. 5 Borg Dep. at 233:12–234:20. And although Borg did not have contracts with these individuals and had not previously sold tobacco to any of them, he was confident that the product would have sold. *See id.* Sutherland calls this testimony speculation, suggesting that it is somehow inadmissible. *See* Def.'s Mem. Supp. SJ at 12. But on summary judgment, such

7

credibility determinations are impermissible. Even assuming that SMK has a duty to prove that it could have performed, Borg's testimony is enough at this stage to withstand Sutherland's motion for summary judgment on this issue.

### III. Statute of Frauds

Third, Sutherland argues that the contracts are unenforceable because they were not signed by a Sutherland representative. Illinois's statute of frauds requires that sales of goods for the price of $500 or more be in writing and must be signed by the party against whom enforcement is sought. *See* 810 Ill. Comp. Stat. 5/2-201(1). Relevant for purposes of this case, there's an exception for merchants. If the contract is between merchants, all that is needed is that a writing be sent after a reasonable time of the agreement. *See* 810 Ill. Comp. Stat. 5/2-201(2). The contract is then enforceable unless the recipient gives a written notice of objection to its contents within 10 days. *Id.*

Sutherland argues that, because it was not a merchant in tobacco, the merchant exception is inapplicable. The definition for merchants, however, is broad. A merchant "means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill." 810 Ill. Comp. Stat. 5/2-104(1). The definition encompasses situations like the one in this case, in which a person holds himself as having knowledge or skill about the goods at issue. Thus, it does not matter, as Sutherland argues, that it has never sold tobacco

8

before. Instead, it is sufficient that Bartusek held himself out as knowing about the tobacco market. *See* Pl.'s LR 56.1 Addt'l Stmt. ¶¶ 54–55. Because Sutherland employed "an agent . . . who by his occupation [held] himself out as having such knowledge," the contract was one between merchants for purposes of the statute of frauds. 810 Ill. Comp. Stat. 5/2-104(1).[3]

## IV. Receipt of the June Contract

Lastly, Sutherland contends that partial summary judgment is warranted as to the June contract because there is no evidence that it was received. Borg sent both contracts to the same address: 1150 Pittsford-Victor Road, Pittsford, NY. *See* Def.'s LR 56.1 Stmt., Ex. 1 2nd Am. Compl., Ex. M & N Purchase Orders. Sutherland's correct address is 1160 Pittsford-Victor Road, Pittsford, NY. *See* Def.'s LR 56.1 Stmt. ¶ 22. Despite the incorrect address, Flanegan admits that the July contract arrived at Sutherland's office. *See id.* ¶ 32. As to the June contract, however, both Flanegan and Bartusek testified that they never saw it. *See id.* ¶ 23. For his part, Borg testified that, after he had sent both contracts, he had a conversation with Bartusek in which Bartusek acknowledged receiving both purchase orders. *See* Pl.'s LR 56.1 Addt'l Stmt. ¶ 51. The question is thus whether there is sufficient evidence from which a jury could find that Sutherland (through Bartusek) received the June contract.

---

[3] Of course, to the extent that Sutherland contends that Bartusek was not its agent with respect to the SMK transactions, genuine issues of material fact prevent summary judgment for the reasons noted above.

Sutherland argues that the presumption of receipt that flows from properly addressed mail is inapplicable because the contracts had the wrong street number. *See* Def.'s Mem. Supp. SJ at 11; *see also Terezov v. Gonzales*, 480 F.3d 558, 565 (7th Cir. 2007) ("When the DHS has mailed notice to an incorrect address, the agency has not effected service in a proper manner and should not benefit from the presumption of receipt that normally flows from proof of mailing."). Yet when the address is slightly incorrect, the presumption may be weakened, but is still raised. *See In re Longardner & Associates, Inc.*, 855 F.2d 455, 460 (7th Cir. 1988). Here, not only was the address marginally off, but the identically addressed July contract arrived at Bartusek's desk. Thus, between the weakened presumption of receipt and the inference that is raised by the arrival of the July contract, there is enough evidence from which a jury could find that the June contract arrived.

But even if that were not enough, Borg testified that Bartusek confirmed receipt of both contracts. Sutherland contends that this statement is inadmissible hearsay. Although Bartusek's statement is being offered for the truth of the matter asserted—and thus fits within the definition of hearsay—because it is being offered against his employer, the statement could fall outside the hearsay rule. *See* Fed. R. Evid. 801(c), (d)(2). The relevant inquiry is whether the statement "was made by [Sutherland's] agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D).

Sutherland argues that any statement related to the tobacco business would be outside the scope of the employment. But the statement at issue is about receipt

of mail. Any employee working in an office setting can, within the scope of his or her employment, acknowledge receipt of mail. Whether the statement was within the scope of Bartusek's employment with Sutherland cannot depend on the contents or subject matter of the mail. To hold otherwise would mean that no assistant could, within the scope of his or her employment, confirm that a letter or package has been received—unless, of course, the letter or package was directly relevant to the assistant's job. Bartusek was an employee of Sutherland and thus could provide confirmation that the contract had arrived at the office. Because the Court finds that the statement was within the scope of his employment for this purpose, it was not hearsay. SMK can thus use Borg's testimony of what Bartusek told him to support the inference that the June contract was delivered.

## Conclusion

For the reasons stated herein, the Court denies Sutherland's motion for summary judgment [99].

**IT IS SO ORDERED.**    ENTERED    9/29/16

_____
**John Z. Lee
United States District Judge**