IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SMK ASSOCIATES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | 14 C 0284 |
| | ) | |
| v. | ) | Judge John Z. Lee |
| | ) | |
| SUTHERLAND GLOBAL SERVICES, INC., and MICHAEL BARTUSEK, | ) ) ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiff SMK Associates, Inc. ("SMK"), brought suit against Sutherland Global Services, Inc. ("Sutherland") and its former Chief Financial Officer, Michael Bartusek, alleging that Sutherland breached two contracts to sell SMK $84 million in tobacco products. Before the Court is the question whether the liquidated damages provisions that are the basis for SMK's damages claim are enforceable under Illinois law, or if they constitute unenforceable penalties. For the reasons that follow, the Court finds that the provisions at issue are unenforceable penalties.

### Procedural History

SMK filed suit against Sutherland and Bartusek on January 15, 2014. *See generally* Compl., ECF No. 1. In Sutherland's July 11, 2014, answer to SMK's second amended complaint, Sutherland raised the affirmative defense that the "amount sought by SMK constitutes an impermissible contractual penalty rather than liquidated damages." Answer to 2d. Am. Compl. at 19, ECF No. 44.

Sutherland moved for summary judgment on October 29, 2015, arguing primarily that Bartusek, who was then its Chief Financial Official ("CFO"), acted of his own accord and not on behalf of Sutherland when he agreed to the purchase contracts with SMK. *See* Def.'s Mem. Supp.

Summ. J. at 8–11, ECF No. 100. In moving for summary judgment, Sutherland did not challenge the enforceability of the contractual penalty provision. *See generally id.* The Court denied Sutherland summary judgment on September 29, 2016, concluding that there was sufficient evidence for a reasonable jury to find that Bartusek was acting on Sutherland's behalf. *SMK Assocs., LLC v. Sutherland Glob. Servs., Inc.*, No. 14 C 284, 2016 WL 5476256, at *5 (N.D. Ill. Sept. 29, 2016).

At the pretrial conference on May 24, 2017, SMK conceded that the only damages that it sought were based on the liquidated damages clauses in the contracts. Whether a contractual provision for damages is a valid liquidated damages provision or an unenforceable penalty clause is a question of law. *ICD Publ'ns, Inc. v. Gittlitz*, 24 N.E.3d 898, 919 (Ill. App. Ct. 2014). As the enforceability of the damages clauses at question would shape the jury trial, the parties agreed to an evidentiary hearing on the issue. *See* ECF No. 154.

## **The Hearing**

Sutherland called two witnesses at the evidentiary hearing: Michael Bartusek, who served as Sutherland's CFO from June 2007 to September 2014, Hearing Tr. ("Tr.") at 7:8–12; and Martin Borg, the sole owner, member, and employee of SMK, *id*. at 94:17–23.

Based upon the testimony and evidence presented at the hearing, the Court makes the following factual findings. At the time Bartusek and Borg first communicated in February 2012, *see id*. at 22:3–23:5, 106:12–21; Def.'s Hrg. Ex. 1, 2/13/2012 TradeKey Email to Bartusek; Def.'s Hrg. Ex. 8, 2/16/2012 Email from Borg to Bartusek,[1] they were both relatively inexperienced in cigarette sales. Borg had started SMK only a few months earlier, intending to sell branded tobacco

---

[1] Def.'s Hrg. Exs. 1 and 8 refer to the exhibits proffered by Sutherland, and admitted by the Court, at the hearing itself. *See* Tr. at 87:23–88:10. All other references to exhibits in this Memorandum Opinion refer to the exhibits attached to the parties' post-hearing memorandums.

2

product through duty-free distribution for export. *See* Tr. at 94:24–95:13. As of February 2012, he had never completed any cigarette purchases or sales through SMK (or any other company, for that matter), nor did he complete any similar transactions at any time relevant to this dispute. *See id*. at 117:2–15. For his part, Bartusek had completed several transactions of cigarettes, but had lost money on them. *Id.* at 42:4–15.

From February until August 2012, Bartusek and Borg regularly communicated about potential cigarette sales via email, telephone, and text message. *See, e.g., id*. at 22:3–23:8, 121:16–124:5, 187:17–205:14; *see generally* Def.'s Post-Hrg. Mem., Ex. D, ECF No. 158-1; Def.'s Hrg. Ex. 8. During these communications, Bartusek provided price estimates for specific cigarette brands and product sources. *See, e.g.,* Def.'s Post-Hrg. Mem., Ex. D at SMK00014, SMK00015.

On or around June 14, 2012, Borg mailed a purchase order ("June PO") to Bartusek at Sutherland's office location, *see* Def.'s Post-Hrg. Mem., Ex. A, 6/14/2012 PO at SMK00001, ECF No. 158-1, although the address was slightly off. *See id.*; Tr. at 33:20–25. The June PO ordered 60,000 master cartons of "Marlboro Red, King Size, Flip Top Box, Swiss," for $678 each; and 60,000 master cartons of "Marlboro Gold, Flip Top Box, Swiss," also for $678 each. 6/14/2012 PO at SMK00001. The total purchase in the June PO came to $81,360,000. *Id.* According to Bartusek, the first time he saw the June PO was in September 2012, when SMK initiated collections proceedings against him. Tr. at 32:4–14.

On or around July 13, 2012, Borg mailed a second purchase order ("July PO") to Bartusek at Sutherland's office location, *see* Def.'s Post-Hrg. Mem., Ex. B, 7/13/2012 PO at SMK00003, ECF No. 158-1, again to the same slightly incorrect address. *See id.*; *see also* Tr. at 33:20–25. The July PO ordered 1,000 master cartons of "Marlboro Red, King Size, Flip Top Box, USA," for $720 each; and 3,000 master cartons of "Marlboro Gold, Flip Top Box, USA," also for $720 each.

3

7/13/2012 PO at SMK00003. The total purchase in the July PO came to $2,880,000. *Id.* Again, Bartusek claims that he did not see the July PO until September 2012. Tr. at 44:18–45:1.

Both the June and July POs included a series of terms and conditions printed on the front and back page of the purchase order ("PO Terms"), *see* 6/14/2012 PO at SMK00001–02; 7/13/2012 PO at SMK00003–04. These terms included product specifications for the cigarettes, required pre-payment inspection, and specified the timeframe in which goods were to be delivered. *See id*. The June PO Terms also noted that the purchase order was for a "twelve month supply to be delivered in twelve equal monthly deliveries," with the "initial delivery 15–25 days after date of this PO." 6/14/2012 PO at SMK00002. The July PO Terms, in contrast, specified that delivery was to be "5–10 days after the date of this PO." 7/13/2012 PO at SMK00004.

The PO Terms included a clause that the Court refers to as the "10% Damages Provision."[2] The provision specified a "10% penalty for non performance payable to SMK Associates LLC by vendor should goods fail to be delivered timely and/or goods are not genuine or in any other manner different than represented by vendor to SMK Associates." *Id.*; 6/14/2012 PO at SMK00002.

Both the June and July PO Terms "fully incorporated" an additional set of terms and conditions contained in a separate document. *See* Def.'s Post-Hrg. Mem., Ex. A, SMK Associates LLC PO Terms and Conditions ("Additional Terms"), at SMK00005–07; 6/14/2012 PO at SMK00002 (referencing Additional Terms); 7/13/2012 PO at SMK00004 (referencing Additional Terms). The Additional Terms specified a range of different types of damages actions available to SMK. For example, SMK "reserve[d] the right, in addition to any and all other legal remedies

---

[2] The relevant term in the purchase order refers to a "10% penalty," and the parties frequently refer to the term as a "penalty clause" and the amount of damages as a "penalty." On this record, the Court finds that what the parties called the clause has little bearing on whether it constitutes an unenforceable penalty under Illinois law.

4

provided by law, to: (a) Deduct any excess transportation charges accrued . . . or (b) Cancel the purchase order in whole or in part in case of strike, fire or other casualty which materially affects SMK operations." Additional Terms § 4.

The Additional Terms also provided that the "[v]endor agrees to reimburse SMK for any costs resulting from late delivery of goods on the purchase order. In addition, SMK may, at its sole discretion, reject or cancel any shipment of goods which will not be delivered by the agreed-upon date of delivery." *Id.* § 5. Furthermore, the terms required the vendor to agree to "reimburse SMK, in full, for any other expenses that were caused by Vendor non-compliance with either the terms herein or the terms on the purchase order, or the terms of any letter of credit regarding the goods of the purchase order," *id.* § 6, and to "reimburse SMK for any return of the goods, whether by SMK or SMK customers, for any reason or no reason." *Id.* § 7.

Borg testified that he had discussed the 10% Damages Provision with Bartusek starting in February 2012, to determine if Bartusek was "genuine" about doing a deal or not, Tr. at 182:13–183:1, 186:12–187:9, and that Bartusek had agreed to the clause, *id.* at 187:3–9. But, notably, the numerous text messages and emails shared between Borg and Bartusek never mention the 10% Damages Provision—or any other penalty or liquidated damages clause for that matter. *See generally* Def.'s Post-Hrg. Mem., Ex. D; Def.'s Hrg. Ex. 8. According to Borg, this was because all discussions of the clause took place over the telephone. Tr. at 109:16–110:7. In particular, he claimed that before sending the June PO, he orally had reviewed the terms and conditions of the purchase with Bartusek, including the 10% Damages Provision. *Id.* at 200:4–16.

Borg also explained his rationale for setting the amount at 10%. He chose 10%, he claims, because it was less than the margin he expected to receive from a successful cigarette transaction, and because he had never seen a penalty clause for less than 10%. *Id.* at 186:20–187:2. But Borg

conceded that his only exposure to penalty or liquidated damages clauses in relation to cigarette sales was hearing about their existence from former coworkers. *Id.* at 182:1–8.

As Borg saw it, the 10% Damages Provision applied to any breach in the agreement, regardless of the scale of the breach. *Id.* at 134:10–135: 17. That said, he admitted that SMK could not collect both actual damages as well as damages under the 10% Damages Provision. *Id.* at 138:15–139:2. Borg further clarified that he saw the June PO as a twelve-month installment contract, where the 10% damages amount could be assessed on a month-by-month basis whenever there was a breach. *Id.* at 142:1–143:24.

Not surprisingly, Bartusek categorically denied ever having discussed the 10% Damages Provision with Borg. *Id.* at 40:18–41:2. Bartusek further testified that he never had any conversations with Borg about what damages SMK or Borg would experience in the event of a breach, nor about how the parties would determine those damages or how difficult it might be to calculate them out. Tr. at 40:3–9, 88:14–89:10. For his part, Borg also conceded that he never discussed the identity of his intended buyers with Bartusek, nor the prices that those buyers would pay for the cigarettes. *Id.* at 100:10–20.

In fact, at the time that Borg sent Bartusek the June and July POs—requesting more than $84,000,000 worth of cigarettes—Borg was not in regular communications with any potential purchasers for those cigarettes. *See id.* at 148:23–171:21. Borg points to documents in an effort to demonstrate the interest that he had received from potential buyers, but the documents are, at best, merely introductory letters expressing initial interest, rather than a definitive discussion of terms. *See generally* Def.'s Post-Hrg. Mem., Ex. E, ECF No. 158-1. Moreover, quizzically, Borg knew almost nothing about the individuals or companies that sent the documents, or how he had come to be in possession of them. *See* Tr. at 148:23–171:21.

6

**Analysis**

Whether a liquidated damages provision is an unenforceable penalty is a question of state law.[3] *Energy Plus Consulting, LLC v. Ill. Fuel Co.*, LLC, 371 F.3d 907, 909 (7th Cir. 2004). For guidance on this question, Illinois courts look to the Restatement (2d) of Contracts, which instructs:

> Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss. A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty.

*Grossinger Motorcorp, Inc. v. Amer. Nat'l Bank and Trust Co.,* 607 N.E.2d 1337, 1345 (Ill. App. Ct. 1992) (quoting Restatement (2d) of Contracts § 356 (1979)).

Consistent with the Restatement, Illinois courts find liquidated damages clauses enforceable when: "(1) the actual damages from a breach are difficult to measure at the time the contract was made; and (2) the specified amount of damages is reasonable in light of the anticipated or actual loss caused by the breach."[4] *Energy Plus*, 371 F.3d at 909 (quoting *Checkers Eight Ltd.*

---

[3] The Additional Terms include an Illinois choice-of-law provision. Additional Terms § 11. Of course, the parties ultimately disagree on whether a contract was formed, which would affect the validity of that provision. However, "[w]here the parties agree on the law that governs a dispute, and there is at least a 'reasonable relation' between the dispute and the forum whose law has been selected by the parties, [the Court] will forego an independent analysis of the choice-of-law issue and apply [the parties' choice]." *Harter v. Iowa Grain Co.*, 220 F.3d 544, 560 n.3 (7th Cir. 2000) (quotation marks and citation omitted). The parties assume in their briefs that Illinois law applies, and SMK was based in Illinois, *see* 2d Am. Compl. ¶ 3, ECF No. 40, suggesting a "reasonable relation" between the state and the dispute. Accordingly, we apply Illinois law.

[4] Of note, "[s]ome Illinois courts also include a third prong: '[whether] the parties intended to agree in advance to the settlement of damages that might arise from the breach.'" *Energy Plus,* 371 F.3d at 909 n.2 (citing *Med+Plus*, 726 N.E.2d at 693 and *Penske Truck Leasing Co. v. Chemetco Inc.*, 725 N.E.2d 13, 19 (Ill. App. Ct. 2000)). The Illinois Supreme Court has never addressed whether this third prong is part of the analysis, but has referred to the two-prong test in dicta. *See People ex rel. Dep't of Pub. Health v. Wiley*, 843 N.E.2d 259, 271 (Ill. 2006). As the third prong is not dispositive in this case, the Court does not consider it.

*P'ship v. Hawkins*, 241 F.3d 558, 562 (7th Cir. 2001)). But if "the sole purpose of the clause is to secure performance of the contract" or "the amount of damages is invariant to the gravity of the breach," the provision is likely a penalty. *Checkers*, 241 F.3d at 562 (citing *Med+Plus Neck and Back Pain Ctr. v. Noffsinger*, 726 N.E.2d 687, 693 (Ill. App. Ct. 2000)). *See also Grossinger,* 607 N.E.2d at 1346 ("The damages must be a specified amount for a specific breach, not a penalty to punish for nonperformance or as a means to secure performance."); *GK Dev., Inc. v. Iowa Malls Fin. Corp.*, 3 N.E.3d 804, 817 (Ill. App. Ct. 2013) (finding that a damages provision that specified the same amount for a total breach and a delay in securing permits was not a reasonable prediction of damages).

"In doubtful cases, [Illinois courts] are inclined to construe the stipulated sum as a penalty," *GK Dev.,* 3 N.E.3d at 816 (citing *Stride v. 120 W. Madison Bldg. Corp.*, 477 N.E.2d 1318, 1321 (Ill. App. Ct. 1985)), "as [t]he purpose of damages is to place the nonbreaching party in a position that he or she would have been in had the contract been performed, not to provide the nonbreaching party with a windfall recovery,'" *id.* (quoting *Jones v. Hryn Dev., Inc*., 778 N.E.2d 245, 249 (Ill. App. Ct. 2002)). That being said, "[c]ourts generally give effect to [liquidated damages] provisions 'if the parties have expressed their agreement in clear and explicit terms and there is no evidence of fraud or unconscionable oppression.'" *Karimi v. 401 N. Wabash Venture, LLC*, 952 N.E.2d 1278, 1290 (Ill. App. Ct. 2011) (quoting *Hartford Fire Ins. Co. v. Architectural Mgmt.*, Inc., 550 N.E.2d 1110, 1114 (Ill. App. Ct. 1990)). Accordingly, it is the burden of the party seeking to avoid enforcement of a liquidated damages provision to show that it is a penalty. *XCO Int'l Inc. v. Pac. Sci. Co*., 369 F.3d 998, 1003 (7th Cir. 2004).

**I.      Difficulty of Measuring Damages at the Time of Contract Formation**[5]

For a liquidated damages clause to be enforceable, the actual damages from a breach must be difficult to measure at the time of contract formation. *Energy Plus*, 371 F.3d at 909; *see also Grossinger,* 607 N.E.2d at 1345–46. In this case, the parties agree that the damages were difficult to measure. Both SMK and Sutherland acknowledge that SMK's lack of sales contracts with end purchasers made estimating damages very challenging at the formation of the contract. *See* Pl.'s Post-Hrg. Mem. at 14; Def.'s Post-Hrg. Mem. at 11 (citing Tr. at 149:15–171:21 and Def.'s Post-Hrg. Mem., Ex. E). Indeed, as Sutherland notes, SMK had "never completed the purchase or sale of a single cigarette." Def.'s Post-Hrg. Mem. at 11 (citing Tr. at 117:2–15). Moreover, the prices for cigarettes were highly dynamic over the time that Borg and Bartusek were communicating. *See* Tr. at 123:13–16 (Borg discussing the rapidly shifting prices Bartusek offered from February through April 2012); *id.* at 206:17–23 (Borg stating that the product SMK had requested from Bartusek had become considerably more expensive). The Court therefore finds that the damages from the breach were difficult to measure at the time of contract formation.

---

[5]      For the purposes of this analysis, the Court assumes that SMK and Bartusek formed a contract to sell cigarettes. That contract must have formed before SMK sent the first purchase order. The contract thus formed at the latest on June 14, 2012.

The Court also notes that Borg and Bartusek provided sharply contradictory testimony on whether the two ever discussed the 10% Damages Provision prior to the issuance of the purchase orders, with Borg testifying that he had discussed the clause with Bartusek from February onward, Tr. at 182:13–183:1, 186:12–187:9, and Bartusek claiming it had never been mentioned, *id.* at 40:18–41:2. After considering the demeanor of the witnesses and the record as a whole, including the fact that the damages provision was not mentioned even once in the numerous written communications between Borg and Bartusek, the Court finds that Bartusek's statements are more credible and that the earliest time that the damages provision arose between the parties was when the June and July POs were sent to Sutherland. That said, whether Bartusek intended to agree to the clause or not does not affect the Court's finding of whether the clause was a penalty and thus unenforceable as a matter of law. Similarly, the Court does not address the parties' arguments on whether the parties intended the clause to be a penalty, as it does not affect the outcome of the case. *See Energy Plus*, 371 F.3d at 909 n.2.

9

## II.  Reasonableness of Damages in Light of Anticipated or Actual Loss

There is a second prong to this analysis, however.  For a liquidated damages clause to be enforceable, the damages proposed in the clause must also be reasonable in light of the anticipated or actual loss.  *Jameson Realty Grp. v. Kostiner*, 813 N.E.2d 1124 (Ill. App. Ct. 2004) (citing *Grossinger,* 607 N.E.2d at 1345–46).

Sutherland advances three arguments as to why the 10% Provision is unreasonable.  First, it argues that 10% was an unreasonable estimate of damages based upon what the parties knew (or did not know) at the time of the contracts' formation.  Def.'s Post-Hrg. Mem. at 11–12.  Next, it contends that the figure was, in fact, unreasonable, arguing that SMK did not suffer any actual damages as a result of the purported breaches.  *Id.* at 11.  Finally, Sutherland maintains that the provision was unreasonable because the 10% applied to all breaches, regardless of their severity. *Id.* at 10.  In response, SMK asserts that Sutherland has failed to meet its burden to demonstrate that the damages were unreasonable and offers what it calls "affirmative evidence" of the provision's reasonableness.  Pl.'s Post-Hrg. Mem. at 13.

### A.  Estimate of Anticipated and Actual Damages

Sutherland first contends that, even taking into consideration the challenge of estimating damages at the time of contracting, SMK's anticipated profit margins were at most about 3%, making 10% an unreasonable estimate of anticipated damages.  Def.'s Post-Hrg. Mem. at 11–12. At the hearing, Sutherland demonstrated that when Borg sent off the June PO requesting Swiss Marlboro Reds and Golds at $678 per master carton, he had no evidence that he could sell the product for more than $700 per master carton.  *See* Def.'s Post-Hrg. Mem., Ex. E; *see also* Tr. at 148:15–149:13 (specifying that Ex. E encompassed all the evidence that SMK had of potential buyers); *id.* at 156:11–159:19 (discussing the March 29, 2012, letter of intent offering $700 per

10

master carton)*.* Based upon this evidence, then, Borg's anticipated profit margin at the time of contracting was at most 3%. *See* Def.'s Post-Hrg. Mem. at 11–12. The only evidence indicating a higher profit margin is from no earlier than July 3, 2012, after the contract was formed. *See, e.g.,* Def.'s Post-Hrg. Mem., Ex. E at 00096 (Unibev Letter of Intent).

In response, SMK does not directly dispute Sutherland's calculations for anticipated damages. *See* Pl.'s Post-Hrg. Mem. at 13 (citing Tr. at 218:6–9). Instead, SMK argues that, given the dynamic nature of the market for cigarettes and SMK's lack of contracts with end-purchasers, a straight 10% percent provision was reasonable. *Id.* But that argument implies that it was reasonable for the parties to assume that, on average, SMK would make a 10% profit if Bartusek had delivered the product. And since Borg was unable to identify any potential buyers whose purchases would result in a profit anywhere near 10%, *see* Tr. at 148:23–171:21, such an assumption is wishful thinking at best.

### B. Estimate of Actual Damages

Sutherland next argues that SMK, as a new business, suffered no actual damages under Illinois law as a result of the alleged breach, and accordingly, 10% is an unreasonable estimate of actual damages. Def.'s Post-Hrg. Mem. at 11. *See Checkers*, 241 F.3d at 562 (finding that a liquidated damages clause that dictated damages excessive to actual damages indicated that the clause was a penalty).

"The general rule under Illinois law is that a new business has no right to recover lost profits." *TAS Distributing Co. v. Cummins Engine Co.,* 491 F.3d 625, 633 (7th Cir. 2007). "The reasoning behind the rule is simply that a new business has not demonstrated yet what its profits will be." *Id.* at 634 (citing *Milex Prods., Inc. v. Alra Lab., Inc.,* 603 N.E.2d 1226, 1236 (Ill. App. Ct. 1992)).

There are exceptions, such as when "experts have provided convincing and non-speculative evidence sufficient to prove lost profits." *Id.* However, all of SMK's estimates of its actual damages rely exclusively on Borg's speculation about his ability to re-sell cigarettes, without any evidence of any actual anticipated sales to potential buyers. *See* Def.'s Post-Hrg. Mem., Ex. E; *see also* Tr. at 148:15–149:13 (Borg explaining that Ex. E encompassed all the evidence that SMK had of potential buyers); 148:23–171:21 (Borg reviewing the limited extent of his communications with those potential buyers). Moreover, it is beyond dispute that SMK was a new business; it was founded only a few months before Borg and Bartusek began communicating, Tr. at 94:24–95:13, and SMK never completed any cigarette purchases or sales at any time relevant to this dispute, *id.* at 117:2–15. The Court thus concludes that 10% is an unreasonable estimate of actual damages suffered by SMK.

### C. Damages in Relation to Scope of Breach

Lastly, Sutherland argues that, because Borg admitted that the 10% applied to any and all breaches, regardless of the severity of the breach, the 10% Damages Provision could not be a reasonable attempt to estimate damages. Def.'s Post-Hrg. Mem. at 10–11 (citing *GK Dev.,* 3 N.E.3d at 817); *see also* Tr. at 134:10–135:17. SMK counters that the provision is far less strict than it might first appear, because the provision operated on a month-by-month basis, meaning that the 10% damages would be imposed only for the months in which a breach occurred. Pl.'s Post-Hrg. Mem. at 9 (citing Tr. at 142:23–143:10). SMK further contends that, even though "the ten percent provision technically applies irrespective of whether the goods are merely delayed or are instead not delivered at all, Borg testified that in the event of a simple delay, the parties would work it out in the spirit of 'an ongoing relationship.'" *Id.* at 9 (citing Tr. at 147:6–19).

12

SMK is right to concede that the provision "technically" applies regardless of the scale of the breach. The provision could not be more clear—it applies "should goods fail to be delivered timely" *or* if they are "in any other manner different than represented by vendor to SMK Associates." 6/14/2012 PO at SMK00002; 7/13/2012 PO at SMK00004. In other words, the provision entitles SMK to 10% of the purchase price whether no cigarettes were delivered, or whether all of the cigarettes were delivered but some did not meet the specifications in any manner. And even if the 10% Damages Provision applies only on a month-by-month basis, as Borg construed it, the 10% amount could be assessed whether the monthly delivery were a few days late or not delivered at all. Accordingly, based upon the record, the Court finds that "the amount of damages is invariant to the gravity of the breach," *Checkers*, 241 F.3d at 562, indicating that the provision was not a reasonable attempt to estimate damages.

### D. SMK's Affirmative Evidence

In response, SMK contends that it offered affirmative evidence at the hearing demonstrating the 10% Damages Provision's reasonableness. Pl.'s Post-Hrg. Mem. at 13. As examples, SMK points to Borg's testimony that penalty clauses were standard in the industry, that 10% was the lowest percentage he had seen in a penalty clause, and that he had selected 10% because of the margin he anticipated. *Id.* (citing Tr. at 186:20–187:2). But Borg's own testimony undercut the credibility and weight of these explanations. First, Borg admitted that his only personal experience with penalty clauses in relation to cigarette sales was having heard about their existence from former coworkers. Tr. at 182:1–8. Moreover, as discussed above, the record considered in its entirety, including the paucity and generality of Borg's own sales research and communications with buyers, demonstrate that an anticipated return of 10% was unreasonable.

13

Accordingly, having considered the record as a whole, the Court finds that, while actual damages from a breach were difficult to measure at the time of the alleged contract formation, the 10% Damages Provision is unreasonable in light of the anticipated and actual loss caused by the purported breaches, because the 10% amount was invariant to the scale of any breach, the anticipated loss was far lower than 10%, and there were no actual damages suffered as a result of the alleged breaches. The Court thus concludes that Sutherland has sustained its burden of demonstrating that the liquidated damages provisions contained in the June and July POs are an unenforceable penalty clause under Illinois law.

## Conclusion

For the reasons stated herein, the liquidated damages provisions that form the basis for SMK's damages claim are unenforceable penalties under Illinois law. The Court sets a status hearing for 7/16/18 at 9:30 a.m.

**IT IS SO ORDERED.**                **ENTERED    7/9/18**

_____

**John Z. Lee**
**United States District Judge**